## STATE OF FLORIDA v. WILLIAMS; STATE OF FLORIDA v. FOSTER, et al.; STATE OF FLORIDA v. LAISTER; and STATE OF FLORIDA v. MATHERS (Consolidated)

Case Nos. 84-5053 CF, 84-5105 CF, 84-7509 CF and 84-7618 CF

Fifteenth Judicial Circuit, Palm Beach County

June 26, 1985

### APPEARANCES OF COUNSEL

**Moira Lasch,** Assistant State Attorney, and **Frank Scott,** Assistant State Attorney, for plaintiff.

**Jeffrey A. Miller** for defendant, Joe Rogers Williams.

**Valentine Gabaldon** for defendants, Neville A. Foster and Valarie Elaine Williams.

**Anthony Natale** for defendant, Dennis Laister.

**Nelson Bailey** for defendants, Gloria and Roy Mathers.

## OPINION OF THE COURT

CARL H. HARPER, Circuit Judge.

The four cases covered in this order are unrelated, but have issues in common. Because of the commonality of issues, this court has decided to enter this consolidated order, as a matter of convenience, to demonstrate the common issues and pattern of arrests.[1]

*STATE v. JOE ROGERS WILLIAMS, et al.,* case #84-5053 CF:

The defendant, Joe Rogers Williams, along with Morris Larry Suggars, is charged with unlawful possession of marijuana in excess of twenty (20) grams in violation of section 893.13(1)(a), Florida Statutes. The information was filed on August 28, 1984 alleging the crime to have been committed on August 2, 1984. On October 31, 1984, a Motion to Suppress was filed on behalf of the defendant, Joe Rogers Williams. On March 12, 1985, a memorandum of law was submitted to the court in support of the defendant's motion. No memorandum was filed by the state. The Motion to Suppress came on for evidentiary hearings on March 12 and April 26, 1985. The defendant was present at both hearings, represented by his attorney, Jeffrey A. Miller. The state was represented by Moira Lasch, Assistant State Attorney. At the conclusion of the hearings, this court deferred ruling pending receipt of proposed orders to be submitted within two weeks. The defense attorney submitted his comprehensive proposed order, attaching the cases upon which he relied. As of this writing, the prosecutor has not favored this court with a proposed order or memorandum. The evidentiary facts are summarized as follows:

At the outset of the hearing on March 12, 1985, Joe Rogers Williams testified on the issue of standing. Based on his testimony, this court found that the defendant had a reasonable expectation of privacy in the areas searched sufficient to raise the issues in his motion.

On August 2, 1984, at about 3:30 p.m., Williams was driving a 1984 rental automobile with a Tennessee license plate in a northerly direction on the Florida Turnpike in Palm Beach County. Morris Larry Suggars was seated in the front passenger seat and Carnell Porter was seated in the rear seat. All three men are black. It is undisputed that the automobile was traveling at a lawful rate of speed, about 40 to 50 miles per hour. Trooper Richard L. Kindell of the Florida Highway Patrol followed the car some distance, but observed no traffic violations

---

[1] As I understand it, there are a number of cases involving similar issues pending before other judges of this circuit. However, those cases have either not been heard or ruled upon yet.

on the part of Williams. However, Kindell decided to stop the defendant's vehicle after it violated Kindell's "three bump rule", that is to say the defendant's vehicle bumped the dividing traffic line three times within one mile without leaving its lane of traffic.[2] According to his own testimony, Kindell wanted to check the defendant's driver's license, registration, rental agreement, and his physical condition.[3] Kindell testified that he went to the driver's side of the defendant's car and "smelled a strong odor of marijuana" coming from the passenger compartment. He also testified he saw seeds and residue, which he believed to be marijuana, on the seat and floorboard of the automobile. Although he did not seize the residue and seeds as evidence, Kindell stated under oath in his written probable cause affidavit that they "proved to be cannabis residue". At that point, the defendant was not free to leave, but had not been formally arrested, according to Kindell's testimony.

At Kindell's request, Williams produced his driver's license, but said the rental agreement was in the trunk of his rental car. Williams opened the trunk of the automobile in Kindell's presence and produced the rental agreement, after which he closed the trunk. A discussion then took place concerning the fact that the rental agreement was in the name of Charles Allen. At about this time, Trooper Jonas C. Jacobs of the Florida Highway Patrol arrived to assist Kindell. Jacobs had just completed assisting in the stop of another automobile driven by a black male a short distance north of the defendant's automobile. That drug stop involved the use of the Sheriff's canine unit.[4] There is no evidence that the two stops were otherwise related.

Kindell briefed Jacobs on what he had observed and smelled. Jacobs did not look into the pasenger compartment of the defendant's automobile or smell any marijuana, according to his own testimony. The troopers decided to obtain consent to search the automobile. Jacobs told Williams that "Kindell had reason to believe you are carrying contraband and we would like to have consent to search", but that no promises could be made. Jacobs told Williams he could refuse to consent, but that if he did so the drug dogs would be called to the scene. Jacobs testified that no verbal or written consent was given by Williams, but that Williams produced the key to the trunk of his

---

[2] On December 17, 1984, Trooper Kindell stopped a 1985 Buick with a Michigan license plate because its driver, Elden Goemaere, violated Kindell's "two bump rule".

[3] On cross-examination, Kindell testified he did not know the automobile was a rental automobile before the stop was made.

[4] It was not shown whether any drugs were seized or arrests were made in that stop.

automobile. The evidence is in dispute as to who actually opened the trunk. Jacobs testified that the defendant opened the trunk, but Kindell testified that he used the defendant's key to open the trunk himself. The defendant testified that it was Jacobs who opened the trunk.

In any event, the trunk was opened, whereupon Kindell and Jacobs testified they smelled raw marijuana. Kindell began to search the luggage in the trunk. When the last suitcase was opened, it was found to contain a plastic garbage bag which in turn contained 13 pounds of raw marijuana. The defendant and his two passengers were then formally arrested and given their Miranda rights. In response to questioning, Williams stated that the suitcase containing the marijuana belonged to Morris Suggars; that he and Suggars had purchased the marijuana in Miami for $2,200, but that Carnell Porter was not involved. Porter was then released from arrest. Kindell then searched the glove compartment of the defendant's automobile "incident to arrest" and found a paper bag containing 26 grams of raw marijuana. There was no evidence that any marijuana had been smoked inside the defendant's automobile. Throughout the entire episode, Kindell kept possession of the defendant's rental agreement and driver's license.

On April 26, 1985, defense counsel called several witnesses in an effort to show that the defendant's automobile was stopped without legal justification because no traffic violation had occurred; that the stop was a mere pretest based on a "drug courier profile" made for the purpose of searching the automobile; and that the defendant had not consented to the warrantless search.

Patricia D. Apicella, the records custodian of Troop K, Florida Highway Patrol, was called to explain the form 125 used by the FHP. She testified that the column titled "total apprehensions" denotes felony arrests and child runaways (of which there have been one in the last two years). She also testified that the FHP furnishes the troopers with written consent to search forms, a copy of which was placed in evidence.

Kerry Sheehan, a licensed private investigator, testified that she prepared a chart on the "total apprehensions" by troopers of Troop K for the years 1982-1984, using form 125 verified to be accurate by Patricia Apicella. Sheehan's chart was placed in evidence as defendant's exhibit 2. Using her chart, Sheehan testified that, in the year 1984, there were no "total apprehensions" before April, but in mid-April "total apprehensions" went up sharply. She testified that the records show that between August, 1982 and June, 1984, Trooper Kindell had 4 "total apprehensions", but from July, 1984 through

137

November, 1984 Kindell had 17 "total apprehensions". The form 125 was not available for the month of December, 1984.

Dale Allen, deputy sheriff of Palm Beach County, assigned to the Organized Crime Bureau dealing with smuggling activities, testified he and Agent Pastor met with troopers of Post 4, Troop K in the spring of 1984 to discuss forfeiture procedures. According to his testimony, Allen did not discuss a drug courier profile during the meeting. However, he did testify that immediately after the meeting concluded he did discuss with a "couple" of troopers, whose names he could not recall, the drug courier profile used by the Palm Beach County Sheriff's Department. Allen told them that the Sheriff's canine unit was available for their use. Allen described the "profile" in some detail, consisting of northbound automobiles with out-of-state license plates or rental vehicles; probably containing just one person (no mention of race or sex); with luggage or spare tire in rear seat; and heavy duty shock absorbers. Allen could not recall if he told the troopers about using the "consent to search" exception.

Mark Collins, deputy sheriff of Palm Beach County, assigned to the Organized Crime Bureau, testified that there is no "specific turnpike drug profile" in the Sheriff's Department. However, he did acknowledge that he testified under oath in a deposition taken in *State v. Randy Hicks*, case number 84-4865 CF, that there is such a turnpike profile as coordinated between his office and Troop K of the Florida Highway Patrol. See page 38 of that deposition. Collins testified before this court, in explanation, that there is a "spoken turnpike drug profile" put together by Agent Allen. Collins acknowledged that he had stated on page 39 of the aforementioned deposition that the "profile" had been disseminated to Troop K in a meeting before July, 1984.

Fred Lang, deputy sheriff of Palm Beach County, Florida, was the next witness scheduled to be called by the defense. Although Lang had been personally served with a subpoena on March 27, 1985, he failed to appear as scheduled on April 26, 1985. Instead, he left on that morning to take his drug sniffing dogs to Clearwater for certification. The evidentiary hearing continued, nevertheless, when defense counsel waived Lang's failure to appear.

Trooper Kindell was then called as a witness by the defense attorney. Kindell acknowledged that his sworn probable cause affidavit stated that the residue mentioned above "proved to be cannabis residue", but that he had not seized it as evidence. He explained that the "proof" consisted of sight and smell. The defense attorney then

138

placed the black suitcase taken from the trunk of the defendant's automobile on the witness stand, directly under Kindell's nose, asking Kindell what it contained. Kindell replied that he did not know because it was not open. The attorney then asked Kindell if he could smell any marijuana, to which Kindell replied, "No". Ironically, when Kindell was told to open the suitcase, it contained the very same plastic garbage bag and 13 pounds of marijuana taken from the trunk of the defendant's automobile.

Jeanne Mignolet was the next witness called by the defense. She is a licensed private investigator from Fort Lauderdale, but was formerly a law enforcement agent with the Florida Alcohol and Tobacco Division. Mignolet testified that she prepared a summary of the probable cause affidavits in the cases filed by the State Attorney's office from June, 1984 through January, 1985 on drug arrests made by the Florida Highway Patrol in Palm Beach County. See the summary placed in evidence as defendant's exhibit 4. Mignolet testified she examined about 300 probable cause affidavits, involving about 106 vehicles, all of which resulted in felony arrests and formal charges being filed by the State Attorney. She testified that the probable cause affidavits rarely indicated the race of the persons involved, but of those affidavits that did most were black or Hispanic. Mignolet testified that, based on her study, she is of the opinion that during the period covered the Florida Highway Patrol in Palm Beach County was randomly stopping northbound vehicles; and that if no contraband was seen in "plain view", the trooper would inform the driver of the drug trafficking problem and ask for consent to search his vehicle.

Morris Suggars testified that he was in the front passenger seat of the defendant's automobile on the date in question. He testified that the defendant was driving normally with the flow of traffic, with no weaving at all. He testified there was no marijuana residue on the seats or floorboards and no one had smoked marijuana in the defendant's automobile.

The defendant, Joe Williams, was the next and last witness to testify. He testified that as he was driving his rental automobile north on the Florida Turnpike at about 50 miles per hour with the flow of traffic, he observed Trooper Kindell's vehicle approaching him from the rear, in the opposite lane. He testified that Kindell got alongside him and followed him for about 4 miles before stopping him with his blue light. Williams got out of his vehicle and met Kindell at the rear of the rental vehicle. Upon request, Williams produced his driver's license. He also opened the trunk of the rental vehicle in Kindell's immediate presence, got the rental agreement, and handed it to Kindell, closing

139

the trunk. At about that time, Trooper Jacobs arrived. Williams testified that there was no marijuana residue in the passenger compartment of his rental vehicle, but there were some fragments of a dry cigar he had been chewing. Williams testified that Kindell handed some of the cigar fragments to Jacobs who then told Kindell, "No, it's not what you're looking for". That testimony was not rebutted by either Jacobs or Kindell. Williams testified that when Jacobs asked him if he could look in the trunk, he told Jacobs that he had already opened it once. He stated that Jacobs told him "the dogs are up on the highway and I can look in the trunk because the rental agreement is not in your name". Feeling he had no choice in the matter, Williams gave the keys to Jacobs without verbally consenting to the search, according to Williams' testimony.

### STATE v. NEVILLE A. FOSTER and VALARIE ELAINE WILLIAMS, Case #84-5105 CF:

The defendants, Neville Foster and Valarie Williams, are charged with unlawful possession of marijuana in excess of 20 grams with intent to sell in violation of section 893.13(1)(a), Florida Statutes. The information was filed on August 17, 1984 alleging the crime to have been committed on August 3, 1984. On May 10, 1985, an Amended Motion to Suppress was filed on behalf of the defendants. The Amended Motion to Suppress came on for evidentiary hearing on May 14, 1985. The defendant, Valarie Williams, was present with her attorney, Valentine Gabaldon, but did not testify. The defendant, Neville A. Foster, was not present, his appearance having been waived by his attorney. The state was represented by Frank Scott, Assistant State Attorney. At the conclusion of the hearing, this court instructed counsel to submit proposed orders within two weeks. As of this writing, neither attorney has complied. The evidentiary facts are summarized as follows:

Both defendants are black. At the outset of the evidentiary hearing, the state stipulated that both defendants had standing on the issues raised in the amended motion. Trooper Scott Martin of the Florida Highway Patrol testified that on August 3, 1984 at about 3:30 a.m. he was patrolling the Florida Turnpike in Palm Beach County. He observed the 1979 Chevrolet Caprice automobile with a Florida license plate being driven by Foster in a northerly direction at 64 miles per hour in a 55 miles per hour zone. With the aid of his blue light, Martin stopped the automobile. As he approached the automobile on foot, Martin smelled a "strong odor of perfume or air freshner" and noticed that although the automobile had air shocks, the trunk was

140

"riding high" and there was no trailer hitch on the automobile, all causing him to suspect that it contained marijuana.

Martin then asked Foster for his driver's license and the vehicle registration certificate, which Foster produced. The automobile was registered to Patrick Reed. Upon questioning by Martin, Foster told him the automobile was owned by a friend whose name he could not recall. He told Martin that he was taking his "sister" to the airport. However, when Martin questioned Williams at the scene of the stop, she told him that she and Foster were girlfriend/boyfriend and were "doing a little hanky-panky". Trooper John Sciascia then arrived at the scene to assist Martin, but he did not speak with either defendant. It started to rain, and Martin asked the defendants to follow him to FHP headquarters. Foster complied by driving his automobile to FHP headquarters. During this trip, Martin still had possession of Foster's driver's license and the vehicle registration certificate. Martin testified that although neither defendant had been formally arrested, neither was free to leave. About 20 minutes elapsed from the time of the stop until arrival at FHP headquarters.

At FHP headquarters, Foster gave Martin a telephone number for Patrick Reed so that he could check out his suspicion that the automobile might be stolen. To the best of my recollection, it was not shown whether Reed was ever contacted. As noted above, Martin suspected the automobile contained marijuana, based on the odor of perfume or air freshner. Therefore, Martin called for assistance of the Sheriff's canine unit.

In the meantime, Sciascia was talking with the defendant, Williams. According to his testimony, she refused to tell him where she was employed, but was otherwise cooperative. Sciascia testified that he looked through the purse of Williams to determine her identity and place of employment. He testified that she neither consented to nor objected to his looking in her purse. Sciascia found payroll stubs from New York City in the name of Williams and also saw a small key in her change purse. He did not remove the key at that time.

In a short time (about 20 minutes), two drug sniffing dogs from the Sheriff's canine unit were brought to FHP headquarters. Both dogs alerted on the trunk of the vehicle that Foster had been driving. The trunk was forcibly opened, without the knowledge or consent of either defendant. Two suitcases and a handbag were removed from the trunk and taken into FHP headquarters.

Upon seeing the suitcases, Sciascia then went back into the purse of Williams and removed the key he had noticed earlier. The key was

141

used to open one of the suitcases. The other suitcase was forced open. Both suitcases contained marijuana weighing a total of about 87 pounds. A small amount of marijuana was also found in the handbag taken from the trunk. Both Martin and Sciascia testified that they had not smelled the marijuana before the suitcases were opened.

*STATE v. DENNIS LAISTER,* case #84-7509 CF:

The defendant, Dennis Laister, is charged in count one with unlawful possession of marijuana in excess of 20 grams in violation of section 893.13(1)(e), Florida Statutes, and in count two with unlawful possession of cocaine in violation of section 893.13(1)(e), Florida Statutes. The information was filed on November 27, 1984 alleging the crimes to have been committed on November 6, 1984. On February 26, 1985, a Motion to Suppress Tangible Evidence, etc. was filed on behalf of the defendant. The motion came on for evidentiary hearings on April 2, 1985 and April 24, 1985. The defendant was present with his attorneys, Anthony Natale and Joseph Minceberg, at the evidentiary hearing on April 2, 1985, but did not testify. The defendant was not present at the hearing on April 24, 1985, but Mr. Natale waived his presence. Frank Scott, Assistant State Attorney, represented the state at both hearings. At the conclusion of the hearing on April 24, 1985, this court instructed counsel to file proposed orders within 10 days. Both attorneys have complied. The evidentiary facts are summarized as follows:

The defendant is black. At the outset of the evidentiary hearing, the prosecutor stipulated that the defendant had standing on the issues raised in the motion. Trooper Scott Martin of the Florida Highway Patrol testified that on November 6, 1984 at about 10:30 a.m. he was traveling north on the Florida Turnpike in Palm Beach County. He was behind the defendant's 1984 Cutlass Oldsmobile with Alabama license plates which was traveling at about 60 miles per hour in a 55 mile per hour zone. According to Martin's testimony, the defendant activated his turn signal indicating a change of lane. Martin testified that he attempted to pass the defendant, but Laister changed lanes abruptly, causing Martin to brake his vehicle to avoid collision. With the aid of his blue light, Martin stopped the defendant for changing lanes without sufficient notice (improper change of lanes).

Upon request, Laister produced his Alabama driver's license and Hertz rental agreement. Trooper Martin made a computer check with negative results. While sitting in his patrol car, Martin wrote out a warning ticket for the defendant and returned to the defendant's vehicle. As he did so, Martin "smelled an odor of marijuana coming from the vehicle", according to Martin's testimony. Martin asked the

142

defendant to step from his vehicle and come to the rear of the vehicle. The defendant complied, whereupon Martin asked him if he was "transporting marijuana" and asked for permission to search the trunk of the automobile. The defendant then spoke with his passenger named Gill, after which the defendant refused to give consent to search. Trooper Martin thereupon got the keys to the defendant's automobile and opened the trunk. Martin asked the defendant if the suitcases and briefcase were his, but the defendant did not answer. Martin then opened the suitcases and found them to contain plastic garbage bags with marijuana weighing about 50 pounds. The briefcase contained about 15 grams of cocaine.

On cross-examination, Martin testified that at the time of the stop, it was a clear day and there was a fair amount of traffic on the turnpike. He testified that when the defendant rolled down his window, he (Martin) detected no odor of marijuana and did not find any evidence of burnt marijuana in the passenger compartment of the defendant's automobile. Martin denied having known the automobile was a rental vehicle before the stop. Martin also denied any knowledge of any drug interdiction program or drug courier profile of the Florida Highway Patrol. Martin candidly testified that the warrantless search was based on probable cause, and was made after the defendant refused his request for consent to search. Martin testified that since May, 1984 he had made about 10-15 similar type arrests, about half of which involved white defendants. He estimated that about 30 percent of his cases involved out-of-state vehicles and about 50 percent involved rental vehicles.

Kerry Sheehan, a licensed private investigator, was called as a witness by the defense. She testified that she had done a statistical study, using highway patrol records, of the turnpike drug arrests made by the Florida Highway Patrol in Palm Beach County. Based thereon, she testified she found few such arrests in 1982 and 1983, but also found that in May, 1984 turnpike drug arrests increased sharply until August and September, when they dropped off. Sheehan testified that of the 45 arrests she checked, 89 percent of the automobiles were northbound on the turnpike; 76 percent of those arrested were black; 55 percent involved the odor of marijuana; 11 percent involved the odor of air-freshener; 3 percent involved the odor of carpet freshener; 3 percent involved the odor of cocaine base; 84 percent of the seizures were from the trunks of the vehicles involved; and 7 percent of the seizures were from both the trunk and passenger compartments of the vehicles involved. Sheehan testified further that of the 45 cases she reviewed, Trooper Martin was the third highest with 7 cases.

At the conclusion of the hearing on April 2, 1985, the court on its own motion asked Trooper Martin if he would be willing to demonstrate his ability to smell marijuana contained in a plastic garbage bag inside a suitcase and placed in the trunk of an automobile. Trooper Martin agreed to do so and the demonstration was scheduled for April 24, 1985 at 4:30 p.m.

However, on April 24, 1985, Lt. Billy O'Bryan of the Florida Highway Patrol appeared with Trooper Martin and announced to the court that the patrol's legal department in Tallahassee would not allow Martin to participate in the demonstration. Therefore, the demonstration was cancelled.

### *STATE v. GLORIA MATHERS and ROY MATHERS*, case #84-7618 CF:

The defendants, Gloria Mathers and Roy Mathers, are charged with unlawfully trafficking in marijuana in excess of 100 pounds, but less than 2,000 pounds, in violation of section 893.135(1)(a), Florida Statutes. The information was filed on November 28, 1984 alleging the crime to have been committed on November 11, 1984. On February 25, 1985, a Motion to Suppress was filed on behalf of the defendants. On April 17, 1985, the defendants filed a memorandum of law in support of their motion. On April 23, 1985, the Motion to Suppress came on for an evidentiary hearing. Both defendants were present with their attorneys, Nelson Bailey and Nancy McClintic, but did not testify. The state was represented by Moira Lasch, Assistant State Attorney. At the conclusion of the hearing, this court instructed the prosecutor to file a responsive memorandum of law within two weeks. As of this writing, the prosecutor has failed to comply. The evidentiary facts are summarized as follows:

The defendants are white. At the outset of the hearing, the prosecutor stipulated that both defendants had standing on the issues raised in their motion, and that the state had the burden to demonstrate a recognized exception to the warrant requirement in the warrantless searches in this case.

At about 7:30 p.m. on Sunday, November 11, 1984, Trooper John J. Sciascia parked his patrol car in the northbound truck parking area of the Lake Worth service plaza on the Florida Turnpike. He had been traveling north and stopped to meet Trooper Nicholsen for a cup of coffee. It was dark. As Sciascia got out of his vehicle, he noticed a 1976 Chevrolet Monte Carlo with the headlights on parked in the northbound passenger car parking area. Thinking someone might have fallen asleep with the headlights on, Sciascia went over to the Chevro-

144

let. He saw that there was no one in the automobile. As he stood alongside the Chevrolet, Sciascia smelled the odor of marijuana coming from the Chevrolet, according to his testimony. Sciascia then leaned over to a 1979 Dodge parked in the space next to the Chevrolet, and smelled the odor of marijuana coming from the Dodge automobile as well. No one was in either car. At about this time, Trooper Nicholsen arrived on the scene, and was called over to the two automobiles by Sciascia. He too smelled marijuana. It was noted that both vehicles had clothing on the back seats, and one of the automobiles also had a spare tire on the rear seat. The Dodge automobile had air shocks. Both automobiles were "sitting low", according to Sciascia. He described certain common characteristics involving automobiles transporting contraband, namely "northbound vehicles with spare tire in rear seat, riding low in the rear end".

Sciascia and Nicholsen then returned to one of the patrol vehicles where Sciascia called for assistance from the Sheriff's canine unit. As they sat there awaiting the canine unit, the two troopers saw the two defendants approach the two automobiles under surveillance. Mrs. Mathers got into the Chevrolet and Mr. Mathers got into the Dodge. Sciascia and Nicholsen then went to the two defendants and advised them that their automobiles were being "impounded" because the troopers suspected they contained contraband, but told the defendants that they were free to leave if they wished. Sciascia then asked to see their driver's licenses. Both defendants handed their Florida driver's license to Sciascia who kept them in his possession, to await arrival of the canine unit. The two defendants then walked toward the restaurant at the service plaza.

About 30 minutes later, agent Mark Collins of the Palm Beach County Sheriff's Department arrived on the scene with two drug sniffing dogs, trained to smell marijuana and cocaine. Both dogs alerted on the trunks of the Chevrolet and Dodge. At this point, Sciascia went over to the defendants who were standing in the restaurant breezeway and "arrested both of them for trafficking". Shortly thereafter, with the aid of a key Mrs. Mathers had left in the ignition of the Chevrolet, Sciascia opened the trunk of that automobile and found plastic wrapped bales of marijuana weighing about 206 pounds. Sciascia then used a hammer and screwdriver to forcibly open the trunk of the Dodge where he found plastic wrapped bales of marijuana weighing about 384 pounds. Sciascia testified that he had not asked either defendant for consent to search the automobiles, but searched them based on probable cause. Sciascia then formally arrested both defendants for trafficking in marijuana.

Sciascia testified that the Chevrolet had a Texas license plate and was registered to Carlene Boney of Houston, Texas; that the Dodge had a Maine license plate and was registered to John L. Lyons of Lisbon Falls, Maine. Sciascia testified that he had not seen either vehicle traveling on the turnpike and did not know either defendant; and that his encounter with them was pure happenstance. Trooper Nicholsen's testimony essentially corroborated that of Sciascia.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

It is undisputed that the search and seizure in each of these four cases was conducted without a search warrant. It is settled law, both under the Fourth Amendment of the U.S. Constitution and Article 1, Section 12 of the Florida Constitution, that a warrantless search of private property is per se unreasonable, subject only to a few specifically established and well-delineated exceptions, and the burden to demonstrate the exception is upon the state. Constitutional provisions for the security of person or property must be liberally construed, and it is the duty of the courts to be watchful for the constitutional rights of the citizens and against any stealthy encroachments thereon. Therefore, if a doubt exists as to whether a warrantless search was reasonably justified, the doubt must be resolved in favor of the person whose property was searched. *Taylor v. State*, 355 So.2d 180 (Fla. 3rd DCA 1978) certiorari denied in 361 So.2d 835 (Fla. 1978). See also *Lee v. State*, 392 So.2d 615 (Fla. 2d DCA 1981) and *Robinson v. State*, 388 So.2d 286 (Fla. 1st DCA 1980) which likewise held that doubts as to whether a warrantless search is reasonable must be resolved in favor of a defendant whose property was searched. If the state fails to carry its burden to demonstrate a recognized exception to the search warrant requirement, the fruits of the search must be suppressed. See the exclusionary rule expressly embodied in Article 1, section 12 of the Florida Constitution, and which must be applied in accord with U.S. Supreme Court standards.

In *Miller v. State*, 403 So.2d 1307 (Fla. 1981), the Florida Supreme Court catalogued the generally recognized exceptions to the search warrant rquirement as follows:

(1). property seized in "plain view" or open fields,

(2). property seized from abandoned premises or property involving no invasion of privacy,

(3). property seized by consent or waiver of one's Fourth Amendment right,

(4). property seized during a "stop and frisk" upon restricted cir-

146

cumstances and limited to a pat-down search for weapons to protect the officer,

(5). property seized by officers in "hot pursuit", which is allowed by the exigency of the circumstances,

(6). property seized during a search incident to a lawful arrest, conducted to protect the officer's safety and to prevent possible loss or destruction of evidence,

(7). property seized in a "motor vehicle search" based upon probable cause that it contains evidence of a crime, and

(8). property seized in an inventory of an impounded automobile.

See also *Ulesky v. State*, 379 So.2d 121 (Fla. 5th DCA 1979) enumerating the exceptions.

As noted above, the prosecutors in these four cases did not file memoranda of law, except for the proposed order submitted in the *Laister* case. Therefore, it is uncertain just which exceptions the state is relying upon. Consequently, this court will briefly comment on each of the above exceptions that do not apply under the evidence presented.

Since none of the evidence sought to be suppressed was in "plain view" or "open fields", exception (1) above does not apply. Since none of the evidence sought to be suppressed was abandoned property or seized from abandoned premises, exception (2) does not apply. Since none of the evidence sought to be suppressed was seized in a pat-down search for weapons during a "stop and frisk", exception (4) does not apply, except as discussed hereinafter. Since none of the evidence sought to be suppressed was seized during a "hot pursuit", exception (5) does not apply. Since none of the evidence sought to be suppressed was seized during an inventory of an impounded vehicle, exception (8) does not apply. The only exceptions that might arguable apply under the evidence presented in these four cases are exceptions (3), (6) and (7), each of which will be discussed separately.

Where the state relies on the consent exception in a warrantless search of an automobile, the state must prove by the totality of the circumstances that the consent to search was freely and voluntarily given. However, there is an apparent difference of opinion in the appellate court decisions as to the standard of proof that must be met in order to establish consent. For example, see *Finney v. State*, 420 So.2d 639 (Fla. 2d DCA 1982), where that appellate court held that where there is no taint from an unconstitutional stop, the state must prove a voluntary consent by a preponderance of the evidence. If, however, the stopping of the automobile is not constitutional, then the

consent must be proved by clear and convincing evidence. See also *Robinson v. State*, 388 So.2d 286 (Fla. 1st DCA 1980) in apparent accord. But see *Leonard v. State*, 431 So.2d 614 (Fla. 4th DCA 1983), and *Taylor v. State*, 355 So.2d 180 (Fla. 3rd DCA 1978), wherein those appellate courts held that the state must prove a voluntary consent by clear and convincing evidence, even though the stops involved in those cases were lawful. See also *Samuels v. State*, 318 So.2d 190 (Fla. 2d DCA 1975) in apparent accord.

Furthermore, in order to prove consent to a warrantless search, the state must clearly prove that the defendant voluntarily permitted or expressly invited and agreed to the search. Mere acquiescence to the apparent authority of a law enforcement officer conducting the search is not a waiver of a valid search warrant. *Robinson v. State*, supra at page 291; *Taylor v. State*, supra at page 183; and *Samuels v. State*, supra at page 192. Of course, since there is no legal requirement that the consent to a warrantless search must be in writing, verbal consent is sufficient, if freely and voluntarily given. Nevertheless, written consent would appear to be the better practice so as to meet a later claim that consent was not given, thereby dispelling any doubts about the issue. Likewise, there is no legal requirement that the consenting party must be advised of his right to refuse consent. Whether such advice was given is merely a factor to be considered in assessing the totality of the circumstances on the issue of whether the consent was voluntary or whether any illegal taint was dissipated. *Taylor v. State*, supra at page 185, and *Finney v. State*, supra at page 643. The legality of the initial stop is significant because any consent to search following an unconstitutional stop is presumptively tained by the illegal stop and hence invalid. See *Robinson v. State*, supra at page 290. Furthermore, if the stop of a vehicle is invalid, any evidence resulting from the stop is inadmissible. *Kayes v. State*, 409 So.2d 1075 (Fla. 2d DCA 1981) and *Wong Sun v. United States*, 83 S.Ct. 407 (1963). Having reached this point, it is now appropriate to discuss exceptions (4), (6) and (7) and the legality of stopping and searching the automobiles' involved herein.

It is undisputed that troopers of the Florida Highway Patrol are empowered to enforce the traffic laws of this state. They may issue citations for traffic infractions and may arrest for traffic crimes. Also, they may arrest for any misdemeanor committed in their presence and for any felony based on probable cause. See section 901.15, Florida Statutes. In other words, their powers are not merely limited to traffic infractions and traffic crimes, but encompass violations of the criminal laws of the state as well. In performing their duties as law enforcement

officers, they may utilize section 901.151, Florida Statutes, which codifies *Terry v. Ohio*, 88 S.Ct. 1868 (1968) and its progeny, and section 933.19, Florida Statutes, which codifies *Carroll v. United States*, 45 S.Ct. 280 (1925) and its progeny.

For a law enforcement officer to make a valid investigatory stop of an automobile under section 901.151, it is not essential that the officer have probable cause to believe that the occupants have committed or are committing a crime. It is only required that the officer have a founded or reasonable suspicion of criminal activity which merits further investigation. Thus, the legality of the stop is dependent upon the facts within the officer's knowledge. *Kayes v. State*, supra at page 1077. A "founded suspicion" is a suspicion which has some factual foundation in the circumstances observed by the officer, when those circumstances are interpreted in the light of the officer's knowledge. "Mere" or "bare" suspicion, on the other hand, is not sufficient to support the stop and temporary detention, because it is no better than random selection, sheer guesswork, or hunch, and has no objective justification. *State v. Stevens*, 354 So.2d 1244 (Fla. 4th DCA 1978); *State v. W.O.R.*, 382 So.2d 763 (Fla. 2d DCA 1980); and *Horvitz v. State*, 433 So.2d 545 (Fla. 4th DCA 1983). If the initial stop and detention is illegal, a subsequet seizure of contraband from the vehicle is similarly illegal because had it not been for the initial approach without justification the contraband would never have been discovered. *Currens v. State*, 363 So.2d 1116 (Fla. 4th DCA 1978). See also *Freeman v. State*, 433 So.2d 9 (Fla. 2d DCA 1983) (evidence in burglary case suppressed because stop of vehicle based on hunch); *Gorney v. State*, 409 So.2d 220 (Fla. 4th DCA 1982) (evidence suppressed because stop of rental vehicles and drivers making contact with one another with portable CB radios not a founded suspicion); *Kayes v. State*, 409 So.2d 1975 (Fla. 2d DCA 1981) (marijuana suppressed because drug smuggling profile not a founded suspicion even though officer smelled marijuana after stop); *Lee v. State*, 392 So.2d 615 (Fla. 2d DCA 1981) (marijuana suppressed because vehicle stopped without founded suspicion); *Laurich v. State*, 376 So.2d 405 (Fla. 1st DCA 1979) (marijuana suppressed because vehicle stopped without founded suspicion); *Romanello v. State*, 365 So.2d 220 (Fla. 4th DCA 1978) (marijuana suppressed because stop of vehicle based on a mere "hunch"); and *Stanley v. State*, 327 So.2d 243 (Fla. 2d DCA 1976) (marijuana suppressed because vehicle stopped on mere "hunch"), which cases clearly demonstrate that evidence seized as a result of an illegal stop must be suppressed. If, however, the state can demonstrate by a clear, unequivocal break in the chain of illegality

149

sufficient to dissipate the taint of an illegal stop (a heavy burden), the suppression may be avoided. See *Tennyson v. State*, 10 FLW 931 (Fla. 5th DCA 1985).

Where an automobile has been lawfully stopped and the officer has probable cause to believe that it contains contraband, he may conduct a non-consensual, warrantless search of the automobile generally, even if the probable cause arose after the stop. *Michigan v. Thomas*, 102 S.Ct. 3079 (1982). In conducting the search, the officer may also search all containers large enough to contain the items for which there was probable cause to search. *United States v. Ross*, 102 S.Ct. 2157 (1982). If an officer has lawfully stopped an automobile based on founded suspicion under section 901.151 (codifying *Terry v. Ohio*), detaining its driver (but not arresting him), he may conduct a non-consensual, warrantless search of those parts of the passenger compartment where a weapon may be hidden on reasonable belief that the detainee is dangerous and may gain access to a weapon. In doing so, he may seize any contraband he discovers during his search for a weapon. *Michigan v. Long*, 103 S.Ct. 3469 (1983). However, a random stop of an automobile without reasonable suspicion for purpose of checking the driver's license violates the search and seizure provisions of the Fourth Amendment. *Delaware v. Prouse*, 99 S.Ct. 1391 (1979). Where an automobile has been lawfully stopped even for a traffic infraction (i.e. speeding) and the officer smells marijuana or sees a container associated with marijuana, two options are available to him. The officer may make a custodial arrest and conduct a warrantless search of the interior of the automobile and its containers incident to the valid arrest. *New York v. Belton*, 101 S.Ct. 2860 (1981). Furthermore, the warrantless search of the automobile may even precede the warrantless arrest provided probable cause to arrest existed at time of the search and that the arrest quickly followed the search. *Rawlings v. Kentucky*, 100 S.Ct. 2556 (1980); *Acosta v. State*, 431 So.2d 715 (Fla. 3rd DCA 1983); and *Dixon v. State*, 343 So.2d 1345 (Fla. 2d Dca 1977). As a second option, the officer may conduct a warrantless search of the automobile based on probable cause. *State v. Schneider*, 401 So.2d 865 (Fla. 3rd DCA 1981) and *Mead v. State*, 381 So.2d 743 (Fla. 3rd DCA 1980).

In airport cases, the so-called "drug courier profile" has been judicially recognized as sufficient to create a well-founded suspicion of criminal activity to support a temporary stop and detention as authorized in *Terry v. Ohio*, codified in section 901.151, Florida Statutes; and any search of the detainee's person or luggage pursuant to his voluntary consent is permissible. *United States v. Mendenhall*, 100

150

S.Ct. 1870 (1980). Since the drug courier profile does not rise to the level of probable cause (as distinguished from founded suspicion), the investigative detention must employ the least intrusive means available to confirm or dispel the suspicion of criminal activity. *Horvitz v. State,* 433 So.2d 545 (Fla. 4th DCA 1983). The detention is therefore severely limited both as to duration and location. See section 901.151(3), Florida Statutes. In evaluating the legality of the detention, the court must look to all the circumstances surrounding the detention to determine if the detainee would have believed that he was free to leave. If during the investigative detention the officers keep possession of the detainee's plane ticket so as to impede his freedom to leave, any consent to search his luggage given during that period is invalid. *Florida v. Royer,* 103 S.Ct. 1319 (1983); *Horvitz v. State,* supra; and *Robinson v. State,* 388 So.2d 286 (Fla. 1st DCA 1980). However, a detainee's luggage may be seized on "reasonable suspicion" and held for a brief, reasonable time to conduct a canine sniff test. See *United States v. Place,* 103 S.Ct. 2637 (1983).

If there are any Florida appellate court decisions expressly extending the "drug courier profile" to investigatory stops of automobiles, I have not found them in my research. The only cases that even come close are *Gorney v. State,* 409 So.2d 220 (Fla. 4th DCA 1982); *Kayes v. State,* 409 So.2d 1075 (Fla. 1st DCA 1981); and *Romanello v. State,* 365 So.2d 220 (Fla. 4th DCA 1978). According to the brief facts in *Gorney,* the defendants were detained after the police observed them driving their rental vehicles and apparently making contact with each other by CB radio. Their automobiles were apparently searched. The appellate court ruled that the trial court erred in failing to grant the motions to suppress because the initial stop was not based on founded suspicion, citing *Kayes v. State* with approval.

In *Kayes,* officer Cunningham who "outlined the profile of a typical drug smuggling operation in Florida" saw an automobile enter and then leave the warehouse he had under surveillance for a suspected drug operation. The automobile was a rental car and was weighted down in the rear. The officer followed the automobile to a restaurant. While the defendants were eating, the officer attempted to detect the odor or marijuana around the suspect automobile, but without success. He observed that the defendants appeared to be nervous while eating. After the defendants left the restaurant in the suspect vehicle, they were stopped by another officer through the use of a "ruse" at the direction of Cunningham. When Cunningham arrived at the scene, he claimed he smelled a faint odor of marijuana through the *keyhole* of the suspect automobile (an amazing feat). When the defendants refused

151

consent to search, the automobile was seized and later searched pursuant to a search warrant. On appeal, the appellate court held that meeting the drug smuggling profile, in and of itself, does not create a well-founded suspicion of criminal activity; and therefore since the stop was illegal, any evidence resulting therefrom was inadmissible. That court opined that "while a profile of smuggling operation may help identify criminal activity, it can also encompass innocent citizens".

In *Romanello*, the defendants were observed by officers as they attempted, with some difficulty, to trailer a boat to their motor vehicle. The boat appeared to be heavily loaded. After the boat was finally trailered, the officers approached and detained the defendants. One of the officers accompanied one of the defendants onto the boat in order to inspect its registration. While on the boat, the officer allegedly smelled the odor of marijuana and said he noticed a "little glob" of marijuana on the deck. A warrantless search of the boat then revealed a large quantity of marijuana. On appeal, the appellate court ruled that the motion to suppress should have been granted because the original stop and detention was not supported by a "founded suspicion", but was based on only a "hunch" (although a good one, as it turned out). See footnote 2 of that opinion on page 221 re alien smuggling profile.

But see the recently published case of *United States v. Sharpe*, 105 S.Ct. 1568, decided on March 20, 1985 by the U.S. Supreme Court. In that case, DEA agent Cooke was patrolling a highway in an area under surveillance for suspected drug trafficking and spotted an overloaded pickup truck with an attached camper traveling in tandem with a Pontiac in a southerly direction near the coast in North Carolina. The truck was being driven by Donald Savage. The Pontiac was being driven by William Sharpe. Agent Cooke noticed that the pickup truck appeared to be overloaded; riding low in the rear, did not bounce or sway when it was driven over bumps or around curves; and that a quilted material covered the rear and side windows of the camper, consistent with pickup trucks and camper shells often used to transport large quantities of marijuana. After entering South Carolina and having followed the suspect vehicles about 20 miles, Cooke decided to make an "investigatory stop" of both vehicles, calling the South Carolina Highway Patrol for assistance. Just as officer Thrasher arrived to assist Cooke, both suspect vehicles turned into a campground road, traveling 55 to 60 miles per hour, exceeding the 35 miles per hour limit. The road eventually looped back onto the highway, onto which both suspect vehicles began to travel south again. The Pontiac stopped, and agent Cooke stopped behind it, detaining Sharpe until backup officers arrived to take over the detention. The pickup truck did not stop, but

152

continued on south, with officer Thrasher in pursuit for about one-half mile before stopping. Upon request of Thrasher, Savage produced his Florida drivers license and a bill of sale to the pickup in the name of Pavlovich. Officer Thrasher informed Savage that he would be detained until agent Cookie arrived and that he was not free to leave.

Cooke arrived about 20 minutes later. He identified himself as a DEA agent, told Savage that he suspected the camper was loaded with marijuana, and asked for consent to search. Savage refused to give consent. Cooke then stepped on the rear bumper of the pickup and noticed that it would not sink lower, confirming his belief it was overloaded. Cooke then put his nose to the rear window of the camper and smelled the odor of marijuana. Using the keys taken from the ignition of the pickup truck, Cooke opened the camper door and seized 43 bales of marijuana weighing 2,629 pounds. Savage was then arrested and taken back to the point where Sharpe was being detained. Sharpe was then arrested.

On the appeal to the Supreme Court, the majority opinion stated that since the lower court had assumed that there was a founded suspicion that Sharpe and Savage were engaged in marijuana trafficking, sufficient to support an investigatory stop under *Terry v. Ohio*, the only issue on appeal was the duration of the pre-arrest detentions. Since the marijuana was found in the vehicle driven by Savage, the majority opinion held that Sharpe's detention bore no causal relation to agent Cooke's discovery of the marijuana, i.e. the marijuana could not logically be considered the "fruit" of Sharpe's detention. Therefore, the only issue on the appeal was whether the 20 minute detention of Savage was reasonable under the circumstances facing agent Cooke and officer Thrasher. The majority opinion concluded that the 20 minute detention was reasonable because agent Cooke pursued his investigation in a diligent and reasonable manner; and that much of the 20 minute period was occasioned by Savage's efforts to elude the officers. The majority opined that no "bright line" rule as to length of detention would be desirable, but must be decided on a case by case basis, based on common sense and ordinary human experience. Justice Blackmun wrote a concurring opinion. Justice Marshall concurred in the judgment only, saying that the prolonged detention was due to evasive actions of the defendants, but differing with the majority's "understatement" of the importance of the *Terry v. Ohio* brevity requirement. Justices Brennan and Stevens wrote separate dissents. The conduct of the defendants in *Sharpe* and the circumstances surrounding the stops of their vehicles are much more probative than those of the recent cases in creating a well-founded suspicion of criminal activity. None of

the defendants now before the court attempted to elude the troopers and their automobiles were not disguised in any way. Therefore *Sharpe* is readily distinguishable.

Having now summarized the ever-changing and somewhat confusing case law that might apply under the facts of the four cases now before this court, I will now attempt to conclude this all-too-lengthy order by making findings of fact on the common issues raised in the cases now before the court.

At the outset, it is common knowledge, of which this court takes judicial notice, that raw marijuana has a distinctive odor that is readily detectable, under ordinary circumstances, by a human nose familiar therewith; that burning marijuana likewise puts off an aroma even more detectable by a human nose familiar therewith; and that trained dogs, having a keener sense of smell, can detect the odor of raw marijuana when the human nose cannot.

On the issue of whether Post 4, Troop K of the Florida Highway Patrol has embarked upon a drug interdiction program based upon the above described "drug courier profile",[5] this court is persuaded by the statistical evidence summarized above to find, as a matter of fact, that during the period of time covered in the statistical analyses, at least some of the troopers have done so, the denials to the contrary notwithstanding. In so finding, let it be emphasized that the problems involved in the instant cases do not arise from a drug interdiction program based upon *a* "drug courier profile", but with *the* "drug courier profile" characteristics set out above which are so broad and indistinct as to ensnare the innocent as well as the guilty. When you boil the above profile down to its essentials, it covers just about every rental automobile or private automobile with out-of-state license plates traveling north on the turnpike or I-95. Since south Florida is a popular tourist area and prosperous economic area, there are countless numbers of such vehicles traveling north on the turnpike and interstate daily. It is easy to prove how many profile stops resulted in drug seizures because records are kept on the resulting arrests. However, it

---

[5] As I understand it, the same issue is pending in other counties on the east coast of Florida and in other states along the eastern seaboard. The troopers in the instant cases deny the existence of a drug courier profile. However, according to recently published newspaper articles, Bobby Burkett, Director of the Florida Highway Patrol in Tallahassee, has acknowledged that the patrol does have and use a "drug courier profile". In Broward County, Circuit Judge Leroy H. Moe has ordered the patrol to release the profile to defense counsel. In Volusia County, where the profile is under attack on a claim of racial discrimination, Circuit Judge McFerrin Smith has ordered the patrol to do likewise.

154

is impossible to prove or even estimate how many profile stops are made without finding any drugs because no records are kept of those unsuccessful stops.[6] While we have a horrendous drug smuggling problem here in South Florida, the ends simply do not justify the unlawful means occasionally employed to combat the problem. The right of privacy and protection against unreasonable searches and seizures guaranteed to all people, the innocent and guilty alike, by our state and federal constitutions must prevail. Good motives and laudible goals must take a back seat to the constitutional protections. Therefore, based on the totality of the evidence presented in each case separately considered in the light of the case law set out above, this court makes the following findings of fact:

As to State v. Joe Rogers Williams, case number 84-5053 CF, the State has failed in its burden to demonstrate, by any standard, a judicially recognized exception to the warrant requirements of the state and federal constitutions. The initial stop of the defendant's automobile was invalid because Trooper Kindell did not have probable cause or a well-founded suspicion that the defendant was engaged in criminal activity. The court is persuaded that the defendant's purported violation of Kindell's self-imposed "three bump rule" was a ruse or pretext; and that the defendant's automobile was stopped because it fit the broad, indistinct drug courier profile, namely a rental car with Michigan plates traveling north on the turnpike. In the alternative, even if the stop had been valid as based on a founded suspicion of criminal activity, this court doubts Kindell's ability to smell the 13 pounds of marijuana contained in a plastic garbage bag, locked in a suitcase inside the trunk of the 1985 buick stopped on the edge of the Florida Turnpike, with traffic going by, emitting all sorts of gaseous fumes and odors. Indeed, Kindell was not able to smell the same 13 pounds of marijuana concealed in the same suitcase when it was placed right under his nose in the courtroom. His testimony concerning the "plain view" of marijuana residue and seeds is not persuasive because Kindell did not seize it as evidence. Likewise, the state has failed to prove by clear and convincing evidence that the defendant consented to the warrantless search. At best, the defendant merely acquiesced to the apparent authority of Troopers Kindell and Jacobs.

As to State v. Neville A. Foster and Valarie Elaine Williams, case number 84-5105 CF, the state has failed in its burden to demonstrate, by any standard, a judicially recognized exception to the warrant

---

[6] Since deputy Lang failed to appear, I have no idea what his testimony would have been. However, I would have been interested in knowing how many times, if any, his drug dogs had been called out by the Florida Highway Patrol only to find no drugs.

requirements of the state and federal constitution. Trooper Martin was justified in stopping the automobile because it was traveling 64 miles per hour in a 55 miles per hour zone. Nevertheless, the totality of the circumstances surrounding this stop for such a minor traffic infraction smacks strongly of a pretext stop for the purpose of a searched based on a broad, indistinct drug courier profile. Martin's suspicion that the automobile contained marijuana was based on the fact that the auto-mobile with Florida plates had air shocks without a trailer hitch; but was riding high in the rear; that the automobile smelled of perfume or air freshener (an anomaly, to say the least); and the defendants gave conflicting statements to him. Under the totality of the circumstances, Martin did not have probable cause or a well-founded suspicion to continue his *custodial* detention of the defendants or to justify his request to have them travel to FHP headquarters. Neither defendant was free to leave because Martin retained Foster's driver's license and vehicle registration certificate. In the alternative, even if Martin had a well-founded suspicion the automobile contained marijuana, the addi-tional detention was invalid both as to duration and location. Likewise, the state has failed to prove by clear and convincing evidence that the defendants consented to the additional custodial detention and warrant-less search. At best, the defendants merely acquiesced to the apparent authority of Troopers Martin and Sciascia.

As to State v. Dennis Laister, case number 84-7509 CF, the state has filed in its burden to demonstrate, by any standard, a judicially recognized exception to the warrant requirements of the state or federal constitutions. Trooper Martin may have been justified in stopping the defendant's automobile in order to issue a warning citation for the alleged improper change of lane (violation of right of way), a minor traffic infraction. It was not until after Martin had made a computer check on the defendant's rental car with Alabama plates (with negative results) and had written his warning citation that he allegedly smelled the odor of marijuana. A minor traffic infraction standing alone does not give rise to an exploratory search of an automobile. Under the totality of the surrounding circumstances of this case, this court is persuaded that the minor traffic infraction was used as a ruse or pretext to stop the defendant's automobile and to conduct a warrant-less search based on a broad, indistinct drug courier profile. Further-more, the court doubts that any human nose could have smelled the relatively small amount of marijuana (about 50 pounds) contained in plastic garbage bags locked in separate suitcases inside the trunk of the rental car, considering the environment of the stop. When a witness testified he smelled an odor, it is impossible to prove that he did not,

**156**

short of a test. Therefore, the credibility of such testimony must be judged on the basis of common sense, considering the totality of the surrounding circumstances. The court is persuaded that Trooper Martin did not have probable cause or even a well-founded suspicion to believe the defendant's automobile contained marijuana and the warrantless search was based on a bare suspicion or hunch (although a correct one, as it turned out). The state failed to prove by clear and convincing evidence that the defendant consented to the warrantless search. In fact, Martin testified that the defendant refused consent.

As to State v. Gloria Mathers and Roy Mathers, case number 84-7618 CF, the state has successfully carried its burden to demonstrate not only by a preponderance of the evidence, but beyond a reasonable doubt, a recognized exception to the warrant requirements of the state and federal constitutions. Since the two automobiles were parked at the turnpike plaza by the defendants on their own volition, no *Terry* stop occurred at that time. Trooper Sciascia approached the Chevrolet, with its headlights on, for humanitarian purposes and not to make a search. While he was alongside the automobile, Sciascia was in a place where he had a right to be. Since there were 206 pounds of marijuana in the trunk of the Chevrolet and 384 pounds of marijuana in the trunk of the Dodge, it is reasonable to believe that Sciascia in fact smelled the odor of marijuana coming from both automobiles. The marijuana was in bales. When the defendants then entered the automobiles, Trooper Sciascia was justified in preventing their departure and placing them in custodial detention or arresting them. He not only had a well-founded suspicion of criminal activity, but had probable cause as well. The warrantless searches, without consent, were based on probable cause. It matters not whether the warrantless searches preceded or followed the arrests.

Therefore, based on the above findings of fact and conclusions of law, it is

ORDERED AND ADJUDGED as follows:

1. The motion to suppress filed in State v. Joe Rogers Williams, case number 84-5053 CF, is granted.

2. The motion to suppress filed in State v. Neville A. Foster and Valarie Elaine Williams, case number 84-5105 CF, is granted.

3. The motion to suppress filed in State v. Dennis Laister, case number 84-7509 CF, is granted.

4. The motion to suppress filed in State v. Gloria Mathers and Roy Mathers, case number 84-7618 CF, is denied.